Good morning, your honors. William Caldarelli on behalf of the appellants, Fred Young and Gary Lee. Your honors, appellants believe in this matter that the district court misapplied the law in particular as to two issues. First, the basis for assertion of specific jurisdiction over Actions Cayman based on Action Cayman's securities activities in California. And second, as to attribution of jurisdictional contacts of Actions Zoo High up to Actions Mauritius and Actions Cayman on an agency theory. Counsel, this is quite a complicated case, but I do have a question, if I may. Under the law of the Ninth Circuit, we apply a but-for test to determine whether a claim arises out of, in quotes, form contacts. What is your best argument that your claims are the but-for result of Actions Cayman's stock sales and marketing activities in California? Thank you, your honor. Great question. The issue here, of course, is what happened to the stock that my clients say was granted to them in Actions Mauritius. The reason their claims arise out of Actions Cayman's security sales in California is that that stock granted to them in Mauritius was, according to Actions' own documents, part of the Actions Mauritius stock that was then acquired by Actions Cayman in a transaction they refer to as a reverse merger and then was marketed and sold on NASDAQ throughout the United States, including extensively in California. And Actions Cayman's stock sales, their securities activities in California were extensive, as set forth in the evidence presented by the plaintiffs below. How did the other owners of Actions Mauritius, how did they receive their stocks in Actions Cayman's? They were allowed... When? In connection with the reverse merger, the shareholders of Actions Mauritius were given shareholder status as shareholders of Actions Cayman. Is that just an entry on the books? This was, I think they call it book entry stock. There were no certificates as far as we've been able to determine that were actually delivered in that sense. It was book entry stock. Isn't that really what your claim relates to, the fact that you weren't given a similar book entry? Well, that is exactly part of it, that my client's stock in Actions Mauritius was then not recognized when all of Actions Mauritius stock, according to Actions Cayman's own security filings, their SEC filings, their internal documentation, all of that supposedly was converted into stock of Actions Cayman. And then the shareholders who were recognized were entitled to participate as selling shareholders in the public offerings made by Actions Cayman on NASDAQ, including extensively in California. Doesn't your argument depend upon showing that the failure to recognize your stocks in Actions Cayman is directly associated with the sale of the securities? And I believe it is, Your Honor, because it was the sale of those stocks that created the market for this. Prior to this, this was privately held Republic of Mauritius stock. It's converted into Actions Cayman stock in order so that it can be brought to market. Following up on Judge Nelson's comment, under this but-for test, but for the sale on the American market, wouldn't you still have had a claim for their failure to recognize the stock in the reverse transaction? Not really, because all it would have ever been was continued to be some book entry. In other words, what creates damages here, what creates a cause of action is suddenly they go out to market, and in their SEC filings, they suddenly say, here's the stock, here's who owns what, here are the selling shareholders, and it's being sold in California, among other places. It's not only California. I recognize that. It's a NASDAQ through the Americas. But there are activities in California. And it is the sale of that stock, the bringing of the stock to market, and not allowing my clients to participate in it that particularizes the injury to my clients. But could you have made a claim when they failed to acknowledge your stock with the reverse transaction? Well, except that that's not known to anybody or seen by anybody or probably even really documented until they put this in a form to go out to market. And it's when they-the way this all came to attention is that they file their preliminary SEC statements, they get ready to do their public offering, and that's when my clients say, great, stock's going to market now. How do I get to participate? And that's the first time where they hear, well, we don't recognize your stock. What stock? Let me just ask a question. Why haven't you named Actions Zuhai as a defendant? Why isn't a suit against Actions Zuhai a viable option for both Mr. Young and Mr. Lee? An excellent question, Your Honor. The compensation package that was given to Mr. Young and to Mr. Lee consisted of two components. Some salary from Actions Zuhai- Salary. Yes. And the salary was paid. There's no dispute there. Actions Zuhai lived up to its portion of the bargain as far as paying these gentlemen their salary. But at the time, this was a startup tech company. So the real value when you get involved with an enterprise like this is the potential that the stock, the equity interest, may eventually have some value. So the other component of their compensation for their services rendered, including, and the record is replete with Mr. Young's activities in California on behalf of Actions where he earned this stock- But not Mr. Lee. Not so much Mr. Lee. Mr. Lee worked in Texas and in China, in those two places. But the stock that he was promised in Actions Mauritius is still the stock being sold in California, among other places, by Actions Cayman. So to answer your specific question, Your Honor, the reason we have sued Actions Mauritius and Actions Cayman is that those were the entities in whom stock was granted. Originally, Actions Mauritius- But I thought, counsel, I thought the question this judge- I thought what Judge Nelson said is not why did you sue these guys, but why did you not sue Actions China? Exactly, Your Honor. And if I didn't address that, let me make it clear. We did not sue Actions Zuhai because Actions Zuhai paid the salary that it was supposed to pay. The other portion of the compensation, the stock granted in Actions Mauritius, that Actions Mauritius, as the parent, was supposed to deliver, was what was not delivered. And that's what this suit is about. In fact, we have never sued and never contended that we did not receive the salary that Actions Zuhai was to pay. The contract was Zuhai? Well, the employment contract was, but the employment contract is very limited on its terms, and it simply says you're going to be paid a salary. The employment contract says nothing whatsoever about the stock. The stock was agreed to separately, and that's detailed in the Declaration of Guanming Chao, submitted in the record, and in the e-mails that Mr. Chao, as general manager, sent to Mr. Young, to Mr. Young's e-mail address in California. So that was a separate arrangement from the parent company, Actions Mauritius, to Mr. Young, and the same thing to Mr. Li. Was there a separate contract with Actions Mauritius? There is not a separate written contract. There was a separate oral contract. An oral contract, and again, the Declaration of Guanming Chao, which is to be accepted as true at this point, specifically says he was the general manager, he was given authority to administer the tech stock plan, and he made the stock grants to Mr. Young and to Mr. Li on behalf of, at the time, Actions Mauritius. So that is what we have sued on. The reason Cayman gets drawn into this, of course, is then Cayman goes through the reverse merger, and it draws up that stock of Actions Mauritius, makes it Actions Cayman stock, and then goes out and begins selling it, including extensive securities activities in California. And those activities in California, therefore, are sufficient to grant specific jurisdiction over Actions Cayman and for conduct or for claims arising from those security sales. And it's not. You've used up most of your time, but I'll give you a couple minutes for rebuttal. Thank you, Counsel. Good morning, Your Honors. It pleases the Court, Philip Cook for Actions Mauritius and Actions Cayman. I'd like to start by addressing the question of the China connection. I recognize that there is a requirement that the Court accept the facts that are in the record and give the party seeking to have jurisdiction the edge on those facts. But I think the Counsel's argument and the briefs are taking a considerable liberty in exaggerating exactly what this record says about what happened. There is some conflict in the record. The gentleman who was working at Zhuhai in 2001, when Mr. Young was hired, said that Mr. Young actually made a trip to China, and it was in China that his employment terms were negotiated. It's interesting, Mr. Zhao, who was the general manager of the Chinese company in Zhuhai, exercised considerable authority under Chinese law as a general manager. What he didn't have, and the record is very clear about this, having taken extensive jurisdictional discovery, plaintiffs, the appellants, do not have any evidence that the Mauritius company ever authorized these stock grants. In fact, the only evidence of a stock grant is a November 26, 2004 email, and it is from Mr. Zhao, who was at the time the general manager of the China company, and it is written to Mr. Young, and it is copied to two people who reported to Mr. Zhao and were employees of the Zhuhai company. The only evidence we have of the Mauritius company's involvement at all is the there's exhibits four and five that are attached to Mr. Young's declaration. He states that he attended, in China, a board meeting of the Mauritius company, and the minutes that are translated of that meeting show that there was a discussion about a tech stock pool and an agreement that would be entered into with employees if the tech stock was granted. Mr. Young, the appellant, then states in paragraph 22 of his declaration, I don't know if the form of this agreement was ever approved or not. Mr. Young was not a board member. He does state that he attended certain board meetings in China. But the evidence is overwhelming. We've actually got a passport. Mr. Young is a resident or a national from Taiwan. His ROC passport has been produced and is in this record, and it shows that he spent considerable time, just from the two pages that are copied in the record, considerable time in China. The declaration from Mr. Li that we've submitted shows that he was hired as a product development manager, and he did that work in China. Now, appellants make much for jurisdictional purposes of all of the work that they say Mr. Young did in California. But I think if you look at the words that Mr. Young uses in his declaration, he states that he believes the work he did was significant, not that the significant amount of time that he spent, or as the briefs then conclude, he principally did his work here. The fact is he was involved in interfaces with three companies where he introduced and was the liaison with senior Juhai management who came to the United States on three or four occasions. That was not his primary job, and the evidence simply does not support that that's what it was, nor does he say that. They have turned and exaggerated his comment that he thought he made significant contributions into an argument that he spent all of his time working in California. It's just not supported by the record. In terms of the specific jurisdiction, I'm happy to address general jurisdiction, but frankly I think the notion that general jurisdiction must approximate physical presence in California, I just don't think there's any cases that even come close to suggesting that. I wouldn't spend a lot of time on it. Yeah, I mean we've got a company that over two years had nine days of people in California. In terms of specific jurisdiction, I would question whether Juhai even has specific jurisdiction. The only evidence in the record comes from Mr. Young, and it's conflicted evidence where he says he was approached in California and a contract was entered into. But let me say this. When we got to oral argument before Judge Anello below, the appellants for the first time in this case, they didn't do it in their opposition briefs below. They did it only at oral argument. They tried to recharacterize this case as arising out of the actions of Kamin when it came to the United States and had its initial public offering. Now, I would invite the court to take a look at the clauses of action that are asserted in the complaint. It's tab four in the excerpts of the record. And if you go through those clauses of action and the assertions that are made, there was only one company that was called Actions in 2001. There was an ownership company called Cristo Capital in 2001, and it was not until July of 2005 that a company called Actions Kamin was even created. It was created for the purpose of raising capital and having an initial public offering in the United States. The company called Cristo Capital, who is the parent in the middle of these two companies, was a company that was not renamed Actions Mauritius until 2005. And that happened in May of 2005 in conjunction with the capital raising and the financing so that this company could expand its operations. The notion that these companies were all acting together when Mr. Young was hired in 2001 and when he was given a stock grant of $10,000 of U.S. stock, U.S. dollars stock in 2003 and a $5,000 U.S. grant of stock in 2004 is rewriting history. Repeatedly in the complaint, they allege that they get... I'm not sure why you're going this direction, but earlier I asked counsel, does plaintiff's claim arise out of Kamin's contacts with the United States? Well, and the point I'm trying to make, Your Honor, is it's never been alleged in the complaint that that is the case. There's no evidence of jurisdictional activity. And in fact, I think the comments of the court is absolutely correct. If the claim is the failure to recognize the rights of a minority shareholder that's not on the books, the fact that it comes to light because of an IPO does not change the fact that they have a claim. They have a claim that is associated with their compensation. In fact, the only thing that that IPO did was create an opportunity. It didn't create a claim. If anything, all it did, and if you listen to the words that appellants are using, it didn't say the complaint came about because of the IPO. They say it gave them an opportunity. It created value. Mr. Caldarelli this morning used the term, it particularized the claim. Well, yes, it may have added some basis for arguing that there are damages which they seek in their complaint, but it didn't create the claim. The claim existed as a result of promises made in 2003 and 2004 in China from the general manager of a Chinese company who was employing two individuals, non-U.S. citizens, to work in China. How close in time was the reverse transaction and the offer of sale? There were a series of transactions. There were some individual shareholders who actually, there was a utilization of some British Virgin Island companies, and it was the British Virgin Island companies that received an exchange of shares. When you hear the term or see the term ordinary shares, those are the actual shares in the company. What are traded on the NASDAQ are... How close were they in time for that IPO in California? Within two months. Well, the IPO was not in California. I understand that. But it was about two months is my recollection. I'm not sure those facts are in this record. It certainly was the subject of discovery below, and it has been the subject of disclosures in all of the SEC files that were done. Do they have, Young and Lee, have a lawsuit against anyone? Well, it was our view that if they had a claim, they should have brought it against Ashton's Zhuhai. We have put two expert opinions in the record to talk about, one, the corporate behavior. That's from Mr. Bergstrom. And then secondly, from a Chinese practitioner that's also in the record that talks about the adequacy of a remedy and the ability to sue Zhuhai in China. Why they didn't do that is not entirely clear. Thank you. Thank you, Counsel, for your argument. Thank you. You have a minute or so for rebuttal. I will try to move through these very quickly then, Your Honor. Regarding the authority of Guanming Chao to grant stock in Ashton's Mauritius, I would refer the Court to Mr. Chao's declaration. It's tab 7, and particularly at paragraphs 6 and 7 where he indicates that he was given authority on behalf of Ashton's to grant the tech stock plan and to grant stock in Ashton's Mauritius and did so to Mr. Young and Mr. Lee. Similarly, regarding Mr. Young's activities in California, those are set forth in his declaration, tab 6, particularly at paragraphs 6 through 17 where he describes his activities in California for which he was granted the tech stock. On the arising out of issue, if I could, on the specific jurisdiction, I would ask the Court to look at the allegations in the complaint, tab 4, paragraph 28, refers to the misrepresentations in the SEC filings of actions and the causes of action for unjust enrichment, you sold stock, Ashton's came in, in California, making a profit off of it that belonged to us rightfully, unjust enrichment. You breached your fiduciary duty. Okay. You have a sentence. Breach of fiduciary duty and conversion claims all go to that arising out of. I didn't get to address the agency theory, Your Honor, but we feel we have briefed the agency theory as well. Very well. Thank you. Thank you, counsel, for your arguments. The case will be submitted. The last case for today is the combined cases, and I assume, since counsel is the same on one side, that you've figured out how you're going to argue this case. The case, two cases that have been combined for oral argument are Wolin v. Jaguar, Land Rover, North America, and Gable v. Jaguar, Land Rover, North America.
judges: Gwin, Nelson D. W., Gould